# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ARRION J. ROSE,                          )
                                         )
      Plaintiff,                       )
                                         )    **Civil Action No. 09-1458**
MICHAEL J. ASTRUE,                       )    **Electronically Filed**
COMMISSIONER OF SOCIAL SECURITY,         )
                                         )
      Defendant.                       )
                                         )

## OPINION

## I.    INTRODUCTION

Plaintiff, Arrion J. Rose ("Rose"), brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final determination of the Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act"). 42 U.S.C. §§ 401-433, 1381-1382f. Before this Court are cross-motions for summary judgment filed pursuant to Federal Rule of Civil Procedure 56. The record has been developed at the administrative level. For the reasons that follow, the decision of the Commissioner will be affirmed.

## II.    PROCEDURAL HISTORY

Rose protectively filed for DIB and SSI on April 17, 2007, alleging disability as of May 1, 2005. (Record of *Rose v. Astrue*, 11, 86-96, 111, 115)(hereinafter "R."). Rose alleged disability due to schizophrenia and depression. R. 115, 115. The applications were administratively denied on August 24, 2007. R. 47-58. Rose filed a timely request for an administrative hearing. R. 59. On February 4, 2009, a hearing was held before Administrative

Law Judge Michael F. Colligan ("ALJ"). R. 25-46. Rose, who was represented by counsel, appeared and testified. R. 25-40. Mike Rose, Rose's father, also testified. R. 41-42. Additional testimony was taken from Ms. Crewell, an impartial vocational expert ("VE"). R. 42-44.

In a decision dated March 27, 2009, the ALJ determined that Rose was not "disabled" within the meaning of the Act. R. 8-24. The Appeals Council denied Rose's request for review on August 26, 2009, thereby making the ALJ's decision the final decision of the Commissioner. R. 1-3. Rose commenced the present action on October 30, 2009, seeking judicial review of the Commissioner's decision. (Doc. No. 1). Rose and the Commissioner filed motions for summary judgment on July 15, 2010, and August 16, 2010, respectively. (Doc. Nos. 11 & 14). These motions are the subject of this memorandum opinion.

## III.   STATEMENT OF THE CASE

Rose was thirty years of age at the time of his hearing before the ALJ. R. 24, 88, 96. He was classified as a "younger person" under the Commissioner's regulation. R. 24. He had a high school education and the ability to read and write English. *Id.* In his claim for benefits, Rose submitted evidence of schizophrenia and depression. R. 86-98.

Rose sought treatment from Paul Soloff, M.D., beginning on January 23, 2007. R. 175. Rose reported that he was paranoid toward others. *Id.* Dr. Soloff examined Rose and found him to be alert and cooperative with normal speech and thought processes. R. 176. Rose did not exhibit any hallucinations or untoward depression or anxiety. *Id.* Rose was diagnosed with schizoaffective disorder and was prescribed Prozac and Risperdal. R. 175-76. Dr. Soloff indicated that Rose understood his symptoms and vulnerabilities. R. 176.

During Dr. Soloff's second examination, approximately four months later, Rose complained of paranoia and suspiciousness. R. 265. He was alert and cooperative with normal

speech and thought processes.  *Id.*  Dr. Soloff indicated that Rose was unduly suspicious and

paranoid of others, but that he had no delusions or specific plans.  *Id.*

On June 25, 2007, Charles M. Cohen, Ph.D., a psychologist, examined Rose at the

request of the state agency.  R. 178-86.  Rose relayed to Dr. Cohen that his mood was "good"

and that his belief that people were conspiring against him was not as prevalent as it had been

and that he tried not to let it affect his behavior.  R. 179.  Rose stated he slept well, but described

his energy as "somewhat low".  R. 180.  Rose indicated that he had "no other complaints in

terms of his mental health symptoms."  R. 179.

Upon examination, Dr. Cohen found Rose to be friendly and cooperative, but slightly

evasive.  R. 180.  Rose made eye contact and appeared to be relaxed.  *Id.*  He communicated with

appropriate language, but somewhat overly elaborated speech.  *Id.*  Rose's affect was euthymic

and he did not appear depressed or anxious.  *Id.*  Rose also had an average general fund of

information and normal abstract reasoning.  R. 181.  Dr. Cohen indicated that Rose remained

goal-oriented and coherent throughout the examination with normal thought productivity.  R.

180.

Dr. Cohen indicated that Rose suffered from paranoia and believed that people and

collective groups may be out to "get him".  R. 180.  Rose did not endorse any suicidal or

homicidal ideations.  *Id.*  Dr. Cohen noted Rose had poor judgment, a fair to marginal ability to

handle stress and "fairly good" concentration and task persistence.  R. 182.  Dr. Cohen opined

that Rose's reliability was questionable.  R. 181.

Rose's prognosis was guarded and Dr. Cohen noted that "this is a difficult call for me

from a disability point of view."  R. 182.  Dr. Cohen concluded that Rose suffered from

symptoms of his mental health impairment, but "they do not appear to be so severe at this point

as to preclude all employment."  R. 183.  Dr. Cohen completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) indicating that Rose had moderate limitations in his ability to understand, remember and carry out short, simple instructions; make judgments on simple work-related decisions; interact appropriately with supervisors and co-workers, and respond appropriately to changes in a routine work setting and work pressures in a usual work setting.  R. 185.  Dr. Cohen determined that Rose had marked limitations in his ability to understand, remember, and carry out detailed instructions and interact appropriately with the public.  *Id.*

Ray M. Milke, Ph.D., a psychologist, reviewed Rose's record and completed a Mental Residual Functional Capacity Assessment on August 6, 2007.  R. 201-04.  Dr. Milke determined that Rose had mild restrictions in his activities of daily living, marked difficulty in social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  R. 197.  Dr. Milke was unable to determine if Rose had experienced "repeated episodes of decompensation, each of extended duration" because of insufficient evidence.  *Id.*

Dr. Milke also evaluated Rose's residual functional capacity ("RFC").  R. 203.  Dr. Milke determined that Rose had marked limitations in his ability to handle complex or detailed instructions and needed limited interaction with the public.  *Id.*  Rose was also found to have an impaired ability to function socially and difficulty working with or near other employees without being distracted.  *Id.*  Rose's frustration tolerance was low and he had a paranoid quality to his behavior.  *Id.*  Stress was noted to exacerbate his symptoms.  *Id.*  Dr. Milke concluded that Rose's limitations resulting from his mental impairment did not preclude him from "performing the basic mental demands of competitive work on a sustained basis."  *Id.*

Rose met with a therapist at Western Psychiatric Institute and Clinic ("WPIC") between April and July 2008. R. 251-66. Throughout the individual therapy appointments, Maritza Daniels, MSW, observed Rose to be cooperative with normal speech, a neutral to full affect, and fairly good eye contact. R. 256, 258, 260, 262, 264. However, Rose was racially preoccupied and paranoid. R. 262. Ms. Daniels also found Rose to be guarded and his conversation was limited to the most immediate concerns. R. 264. At times, Rose had slightly disorganized speech. R. 256, 258.

On September 11, 2008, Ms. Daniels noted that she had been unable to contact Rose. R. 255. Ms. Daniels telephoned Rose's mother who informed her that Rose had been decompensating for the "last four weeks and that he [had become] progressively worse." *Id.* Mrs. Rose reported her son was disorganized, experiencing visual and auditory hallucinations, and was stripping naked. *Id.* Rose refused to be evaluated and Ms. Daniels urged Mrs. Rose to contact Mobile Crisis. *Id.* Ms. Daniels also reminded Mrs. Rose that she could call the police if Rose became threatening. *Id.* On September 15, 2008, Ms. Daniels telephoned Mrs. Rose who relayed that Rose had been missing for several days and the family had called Washington County police to determine their 302[1] guidelines. R. 254.

---

[1] Involuntary Commitment (aka "a 302") is defined as follows:

"An involuntary commitment is an application for emergency evaluation and treatment for a person who is dangerous to themselves or others due to a mental illness. Dangerousness is determined based on the following criteria:

- Danger to self shall be shown by establishing that within the previous 30 days:
  - the person would be unable without the care, supervision and assistance of others to satisfy his/her need for nourishment, personal or medical care, shelter or self protection or safety and that death or serious physical debilitation would occur within 30 days unless treatment was provided;

5

On September 13, 2008, Rose was admitted to the Washington Hospital.  R. 231.

Doctors noted that Rose had not been taking his prescribed psychotropic medications.  *Id.*  Rose

appeared paranoid and disorganized.  *Id.*  He presented with "very bizarre behavior" and

continued to refuse medication.  *Id.*  Rose was diagnosed with paranoid schizophrenia and

eventually placed on Prozac and Risperdal.  *Id.*  Abilify was added and he was given injections

of Risperdal Consta and required one Geodon injection for break-through psychosis.  *Id.*

---

- o the person has attempted suicide or the person has made threats to commit suicide and committed acts in furtherance of the threats; or
- o the person has mutilated himself/herself or the person has made threats to mutilate themselves and committed acts in furtherance of the threats.
- • Danger to others shall be shown by establishing that within the previous 30 days the person has inflicted or attempted to inflict serious bodily harm on another or has threatened serious bodily harm and has committed acts in furtherance of the threat to commit harm to another.

Because this commitment is involuntary it may require the assistance of family, crisis professionals, police, ambulance and any other person involved in the crisis.

In every 302 a petitioner is required to sign the 302 and appear at a hearing if necessary. A petitioner must have first-hand knowledge of the dangerous conduct and be willing to go to an emergency room or the Office of Behavioral Health (OBH) to sign the 302 form.

The petitioner may be required to testify at a hearing regarding the dangerous conduct that he or she witnessed. A police officer or a doctor has the authority to initiate a 302 without prior authorization from the OBH delegate. The OBH delegate can be reached by calling 412-350-4457.

Once a 302 is authorized, the individual will be taken to an emergency room by the police or ambulance for an evaluation by a physician to determine if they need to be admitted for involuntary psychiatric inpatient treatment.  If the individual is admitted they may be kept no longer than 120 hours unless a petition for a 303, Extended Emergency Involuntary Treatment, is filed by the hospital."

Allegheny County, <u>Voluntary and Involuntary Commitment of Persons During a Mental Health Crisis</u>, Allegheny County Department of Human Services, (September 15, 2010), http://www.alleghenycounty.us/dhs/commitment.aspx/.

Rose presented a somewhat anxious mood and a blunted affect, which improved with one-on-one interactions. R. 232. Rose's thoughts were somewhat disorganized. *Id.* Rose's judgment was impaired and he had "no insight." R. 234. He had intact memory and presented with less guarded behavior and suspiciousness. R. 232. Although Rose denied the presence of hallucinations, doctors believed he may be hallucinating. R. 234. During his hospitalization, Rose denied suicidal or homicidal thoughts. R. 232. Rose was discharged on September 23, 2008, following a 304 hearing[2]. R. 238.

On September 28, 2008, Ms. Daniels from WPIC contacted Mrs. Rose who reported that Rose was agitated "at times" and isolative. R. 253. Ms. Daniels encouraged Mrs. Rose to contact Washington County Mobile Crisis. *Id.*

Rose was re-admitted to the Washington Hospital's Behavioral Health Unit from October 5, 2008, until October 23, 2008. R. 212. Rose was admitted on a 302 basis because doctors believed he was unable to sign himself in. R. 251. He was diagnosed with paranoid schizophrenia. R. 210. Rose appeared to be grossly paranoid and psychotic. R. 212. Prior to admission, Rose had refused to take medications. *Id.* He was not cooperative at the initial

---

[2] Longer-Term Inpatient Treatment (aka "a 304/304b")

"When a doctor determines that the individual is in need of continued involuntary inpatient treatment beyond the 20 days authorized by the 303, a 304b, Longer-Term Inpatient Treatment, is considered. The hospital must file a petition and request another hearing. Testimony is provided by the treating psychiatrist stating that the patient is still suffering from a severe mental illness and needs further treatment. The Mental Health Review Officer can order further treatment for a period not to exceed an additional 90 days."

Allegheny County, Voluntary and Involuntary Commitment of Persons During a Mental Health Crisis, Allegheny County Department of Human Services, (September 15, 2010), http://www.alleghenycounty.us/dhs/commitment.aspx/.

examination. *Id.* During his hospitalization, Rose required either Zyprexa Zydis or injections to control his behavior, but he gradually became more accepting of his medications. *Id.* Rose denied hallucinations, but doctors believed he "could very well have been experiencing hallucinations." *Id.* Rose was decreasingly guarded and paranoid throughout his hospitalization. *Id.* Rose's thoughts appeared to be organized and he was oriented in all three spheres. R. 213. His memory was intact. R. 213. At discharge, following a 304 hearing, Rose had limited insight and remained somewhat guarded and paranoid. R. 212.

Following his second hospitalization at the Washington Hospital, Rose was compelled by a Washington County court order to begin treatment with Dr. Dyer through Centerville Clinics, Inc.'s partial hospitalization program. R. 270. On October 27, 2008, Dr. Dyer noted that Rose had been "hospitalized (on two occasions after going off of his medications)." R. 274. Dr. Dyer's examination revealed Rose to be cooperative with normal intellectual functioning. R. 275. Rose had a bland and occasionally sad affect, with some memory loss. R. 275-76. The following month, Rose remained cooperative and denied suicidal intentions. R. 271. On January 28, 2009, Dr. Dyer noted that Rose was "relatively stable, [with] no significant problems on current meds." R. 269.

At the hearing on February 4, 2009, Rose testified that he had worked since his alleged onset date, but that his "severe paranoia" and his short term memory loss made his everyday routine overwhelming and led to hospitalization. R. 39. He also testified that working increased his stress and exacerbated his symptoms. *Id.* Rose testified that his outpatient treatment with Dr. Dyer had been the most helpful and organized outpatient program he had attended. R. 36.

**IV.    STANDARD OF REVIEW**

This Court's review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)(internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42

U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Sec'y of Health, Educ. & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rule making authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."[20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003)(footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's

decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196.

The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision.

## V. THE ALJ'S DECISION

The ALJ determined that Rose had not been under a disability from May 1, 2005, through the date of his decision. R. 24. At step one, the ALJ determined that Rose had not engaged in substantial gainful activity since his alleged onset date. R. 13. At step two, the ALJ determined that Rose had the severe impairments of schizophrenia, schizoaffective disorder, and a history of poly-substance abuse. R. 13. The ALJ found that Rose's substance abuse did not result in any serious functional limitations. R. 14.

At step three, the ALJ assessed Rose's impairments by the criteria of § 12.00, Mental Disorders and his emotional impairments by the criteria of § 12.03 Schizophrenic, Paranoid and Other Psychotic Disorders, and § 12.04, Affective Disorders. R. 14. The ALJ considered the evidence of record as it related to the four broad functional areas and concluded that Rose had

mild restriction in his activities of daily living, marked difficulty in social functioning, moderate difficulties maintaining concentration, persistence or pace, and had experienced one or two episodes of decompensation as evidenced by his history of hospitalizations. *Id.* Based on her review of the record, the ALJ determined that Rose did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1525, 404.1526, 416.925, 416.926.

The ALJ determined that Rose had the RFC to perform a full range of work at all exertional levels, but "no more than simple routine repetitive tasks that are performed in a low stress work environment involving no more than minimal contact with the public." R. 15. At step four, the ALJ determined that Rose was unable to perform his past relevant work as a telephone solicitor, fast food worker, or closing coordinator. R. 23. However, considering Rose's age, education, work experience, and RFC, the ALJ concluded at step five that Rose was capable of successfully adjusting to work in representative occupations such as a laundry worker, hand packer, and a janitor. R. 23-24. The VE's testimony established that these jobs existed in the national economy for the purposes of 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). R. 43. Therefore, the ALJ concluded that Rose had not been under a disability as defined by the Act during the applicable time period. R. 24.

## VI. DISCUSSION

Rose contends that the ALJ's decision is not supported by substantial evidence because his mental impairments met the criteria of listing § 12.04, Affective Disorders. Doc. No. 12, 3. The Commissioner contends that the ALJ's decision is supported by substantial evidence. Doc. No. 15, 11-12.

It is the ALJ's burden to identify the listed impairments found in 20 C.F.R. Part 404, Subpt. P, Appx. 1, relevant to the claimant's impairments. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 n. 2 (3d Cir. 2000). The claimant bears the burden of showing that his impairment meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(iii). *Burnett*, 220 F.3d at 120 n.2 (*citing Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992)). In determining whether a claimant has met this burden, the Commissioner must specify those listings that potentially apply to the claimant's impairments and give reasons why said listings are not met or equaled. *Burnett*, 220 F.3d at 119-20 n. 2; *Scatorchia v. Comm'r of Soc. Sec.*, 137 Fed. Appx. 468, 471 (3d Cir. 2005) (The Commissioner must evaluate "the available medical evidence in the record and then [set] forth that evaluation in an opinion . . . .").

According to the five-step sequential evaluation, if a claimant meets a listing's criteria, the evaluation ends at step three because the claimant is considered to be *per se* disabled and benefits are awarded. *Santise v. Schweiker*, 676 F.2d 925, 927 (3d Cir. 1992). The United States Supreme Court has held that a claimant must prove that his condition meets every criteria in a listing before he can be considered disabled *per se*. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

The required level of severity for §12.04, Affective Disorders is met when a claimant demonstrates that he meets the requirements of part A and part B or C. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. R. 14. Here, the ALJ determined that Rose met part A, but determined that Rose had not established that he met the criteria of parts B or C[3]. Rose alleges that the record demonstrates that his mental impairments met § 12.04 Part B. Doc. No. 12, 4. To meet part B, a claimant must demonstrate a least two of the following: "1. Marked restriction of activities of

---

[3] Rose only challenges the ALJ's decision in regards to his determination that § 12.04 Part B was not met. Doc. No. 12. Therefore, the remainder of the discussion will focus on §12.04 Part B.

daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation each of extended duration." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04B.

The ALJ determined that Rose had marked difficulties in maintaining social functioning. R. 14. However, the ALJ concluded that Rose's mental impairments did not meet § 12.04 Part B because the record established that he experienced only mild restriction in his activities of daily living, moderate difficulty maintaining concentration, persistence or pace, and "one or two episodes of decomposition." *Id.* Therefore, because Rose did not meet Part A and B, the ALJ determined Rose had not established that his mental impairments met or medically equaled § 12.04 Affective Disorders. R. 15.

In reviewing the ALJ's step three findings, this Court, "must look at the ALJ's decision, as a whole, to determine whether the ALJ considered the appropriate factors in reaching the conclusion that [the claimant] did not meet the requirements for any listing." *Izzo v. Comm'r of Soc. Sec.*, 186 Fed. Appx. 280, 285 (3d Cir. 2006)(unpublished). The ALJ is required to give an "explanation of findings [that will] permit meaningful review." *Jones*, 364 F.3d at 505. On appeal, this Court must not re-weigh evidence of record even if it is discredited by the ALJ; the Court's review is limited to determining if the ALJ's decision is supported by substantial evidence. *Monsour,* 806 F.2d at 1190.

### A. *Activities of Daily Living*

The ALJ's determination that Rose had mild restrictions in his activities of daily living is supported by his thorough discussion of the record. R. 14. The ALJ noted that Rose testified that he was reasonably able to function. R. 14, 29. On his function report, Rose indicated that he spent time reading and writing and he was able to take care of his personal needs and perform

14

many household chores.  R.14, 122-29.  Rose reported to Dr. Cohen that he helps his mother with the cooking, cleaning and shopping.  R. 18, 181.  The ALJ also noted that Rose went outside daily and traveled by foot, public transportation and as a passenger in a car to shop for food and other items.  R. 14.  Furthermore, Rose "spends time with others and reported no problems getting along with family or friends."  *Id.*

Rose's ability to function on a daily basis was also addressed in determining his residual functional capacity.  The ALJ noted that Rose traveled to his evaluation with Dr. Cohen by public transportation.  R. 18.  In June 2008 Rose reported to his therapist at WPIC that he was writing a book which he was attempting to get published.  R. 19.  Rose's ability to maintain a regular daily schedule was also noted.  R. 22.

Based on his review of the record, the ALJ determined that Rose's daily activities "are not indicative of a person who is totally disabled and show that he is able to function quite well."  R. 20.  Despite finding that Rose's restrictions of daily living were mild, the ALJ determined that his "emotional problems reasonably may be expected to limit his ability to perform all but the simplest tasks."  R. 20.  However, the ALJ continued that "to the extent the claimant alleges he cannot work within the scope of the residual functional capacity adopted here, I find the allegation not credible."  *Id.*  This analysis is consistent with Dr. Milke's conclusion that Rose had mild restriction of activities of daily living.  R. 18, 197.

The ALJ's discussion of Rose's level of impairment in his daily activities addressed the relevant testimony and medical evidence and contains a statement of fact supporting his decision that such limitations were mild.  R. 14, 18-20.  Therefore, the ALJ's analysis is supported by substantial evidence because he cited "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

### B. *"Repeated Episodes of Decompensation"*

During the applicable disability determination period, Rose was hospitalized for extended periods of time as a result of his mental health impairments. These hospitalizations were addressed by the ALJ, but do not meet the Act's definition of "repeated episodes of decompensation." C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(A)(4).

The ALJ's decision thoroughly discusses Rose's hospitalizations in September and October 2008. R. 19. The ALJ noted that Rose was involuntarily admitted on a 302 petition to the Washington's Hospital behavioral health unit on September 13, 2008. R. 19, 236. Following treatment and medications changes, including injections, Rose's "affect improved and there was less looking over his shoulder." R. 19, 231. Rose denied any suicidal thinking. *Id.* Dr. Urrea's assessment that Rose was alert and oriented was also noted. *Id.* Rose's mental status examination on discharge showed Rose's "mood as somewhat anxious and affect blunted, but he "improve[d] one on one.'" R. 19, 232. Rose's speech was fluent and his thoughts were fully oriented and intact. *Id.* Dr. Urrea recommended outpatient therapy and prescribed a Risperdal Consta injection every two weeks and Abilify, Prozac, and Risperdal. *Id.* The ALJ noted that Rose was stable at discharge. *Id.*

Less than two weeks later, Rose was re-admitted to the Washington Hospital's Behavioral Health unit on another 302 involuntary petition. R. 212. At admission, Rose refused medications and was uncooperative. R. 212. Rose became more accepting of his medications, but "disagreed with his need for any type of psychopharmacologic agent." *Id.* Rose was given Zyprexa and Risperdal, Abilify, and Risperdal Consta. *Id.* Despite being heavily medicated, Rose "frequently" required injections of Abilify and Geodon to control his behavior. *Id.* The ALJ noted that Rose's guarded behavior and paranoia decreased during his hospitalization. R.

19.   Rose's mental status examination showed that he was guarded and had a blunted affect with limited insight and judgment.  R. 19, 212.  The ALJ also noted Dr. Urrea's finding that Rose's concentration was good and that he was fully oriented with intact memory.  *Id.*  A petition was filed for commitment to outpatient care and Rose was discharged to continue his psychiatric care at Washington Communities Mental Health.  R. 213.  The ALJ noted that Rose's GAF at discharge was 35.[4]  R. 19, 213.

The ALJ also addressed Rose's hospitalizations prior to his alleged onset date.  R. 16-17. From January 2002 until February 6, 2002, Rose was hospitalized at the St. Francis Medical Center on a 302 basis due to catatonic behavior and state.  R. 16, 166-167.  The ALJ discussed that Dr. Soraya Radfar started Rose on medications which improved his condition allowing him to eat and sleep and participate in therapeutic activities.  R. 16.  Rose was transferred to residential treatment and was in "fair condition."  R. 16, 167.  Rose was diagnosed with severe recurrent major depression with psychotic features and schizoid personality disorder.  *Id.*  The ALJ noted that Dr. Radfar surmised that Rose's prognosis was "good if he remains in treatment." *Id.*

---

[4]  A global assessment of functioning ("GAF") score is used to report an individual's overall level of functioning with respect to psychological, social, and occupational functioning.  The GAF scale ranges from the lowest score of 1 to 100, the highest score possible. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness.  Diagnostic and Statistical Manual of Mental Disorders, ("DSM-IVR") 34 (4th ed. 2000).

A GAF of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  DSM-IVR, 32.

Furthermore, the ALJ addressed Rose's July 2003 voluntary admission to WPIC for his history of schizophrenia and schizoaffective disorder. R. 16-17, 168-173. Rose reported that he had not been taking his medications for four months prior to his admission. R. 16-17, 168. The ALJ noted that Rose's therapist indicated that he was usually high functioning and had been working, but decompensated after he stopped taking his medications. R. 17. Rose complained to the staff that he was unsure why he was hospitalized and attempted to leave the facility. R. 169. At times, Rose was uncooperative and glared angrily at others. R. 169. The ALJ noted that Rose's speech was normal, his thought processes were linear, coherent, and goal directed. R. 17, 170. Doctors reported that Rose did not experience auditory or visual hallucinations. *Id.* Dr. Michael Jacobson assessed marked improvement and Rose was discharged on Prozac and Risperdal. *Id.* The ALJ noted that Rose's GAF on discharge was 50[5]. R. 17, 172.

Although Rose has been hospitalized several times for his mental impairments, they do not meet the criteria of "repeated episodes of decompensation." The Act defines decompensation as follows:

> exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode. C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(A)(4).

---

[5] A GAF score of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job." DSM-IVR, 32.

In order demonstrate repeated episodes of decompensation, Rose had the burden to prove that he had experienced "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."[6]   C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(A)(4).

The ALJ addressed Rose's hospitalizations for his mental impairments and explained his findings in a manner which permits meaningful judicial review.  *Jones v. Barnhart*, 364 F.3d 501, 505.  However, the ALJ found that Rose did not experience "repeated episodes of decompensation".  R. at 16-17, 19.  Within one year, Rose was involuntarily hospitalized for eleven and nineteen days.  R. 210-30.  This does not meet the requirements of § 12.04(B)(4). The ALJ's decision that Rose did not experience repeated episodes of decompensation is supported by substantial evidence.  R. 16-17, *Monsour,* 806 F.2d at 1190.

### C.  *Concentration, Persistence, and Pace*

The ALJ's decision that Rose had moderate difficulty maintaining concentration, persistence, or pace is supported his analysis of the record.  As noted by the ALJ, Dr. Cohen found that Rose's thought productivity was normal and Rose appeared goal directed and coherent.  R. 18.  His remote and recent memory was also intact.  *Id.*  Dr. Cohen determined Rose's concentration and task persistence to be "fairly good" and his ability to manage stress to be fair to marginal.  *Id.*  The ALJ further observed that other medical opinions indicated that Rose had good concentration including: during his July 2003 hospitalization at WPIC, Dr. Jacobson determined that Rose's attention and concentration was good and upon discharge from

---

[6] Episodes of decompensation which did not meet the frequency requirement would be judged to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(A)(4).

Washington Hospital in October 2008, Dr. Urrea found Rose's concentration to be good. R. 17, 170, 213.

The ALJ's determination is also supported by Dr. Milke's mental residual functional capacity assessment. R. 201-204. Dr. Milke indicated that although Rose was markedly limited in his ability to carry out detailed instructions, he was only moderately limited in his ability to maintain attention and concentration for extended periods. R. 201. The ALJ adopted Dr. Milke's assessment noting that it is an expert opinion under Social Security Ruling 96-6p and Dr. Milke supported his opinion with the "thorough analysis of a reviewing doctor." R. 21. The ALJ gave Dr. Milke's opinion significant weight "because it appears consistent with the claimant's treatment and examination records and because of the rationale which supports it." *Id.*

The ALJ's determination is consistent with Dr. Cohen's assessment. R. 178-186. Dr. Cohen's mental medical assessment form indicated that Rose had marked limitations in his ability to understand, remember, and carry out detailed instructions. R. 185. However, Rose's ability to understand, remember, and carry out simple instructions was only moderately limited. *Id.* Dr. Cohen concluded that although Rose's "symptoms still bother him to some degree they do not appear to be so severe at this point as to preclude all employment." R. 183. Based upon his review of the record, the ALJ determined that Rose's "mental impairments reasonably may be expected to limit him in this area, but not to the point that he cannot perform the simple, low-stress tasks specified in the residual functional capacity adopted." R. 14. Despite Rose's contention otherwise, the ALJ accepted Dr. Cohen's assessment by limiting Rose to simple routine repetitive tasks in a low stress work environment involving no more than minimal contact

with the public.  R. 15.  The ALJ found that such a residual functional capacity accommodated the shortcomings established by Rose's record.  R. 18.

Finally, Rose contends that the ALJ failed to consider the entire record properly, including his low GAF scores.  Doc. No. 12, 5.  The GAF scale "constitutes medical evidence accepted and relied upon by a medical source and must be addressed by an ALJ in making a determination regarding a claimant's disability."  *Colon v. Barnhart*, 424 F. Supp. 2d 805, 812 (E.D. Pa. 2006).  However, the ALJ addressed Rose's GAF scores of 35 or below throughout his opinion.  R. 11-24.  The ALJ decided not to afford the low GAF scores much weight because "they were prepared at the time that the claimant had been experiencing a decompensation which required hospitalization(s)."  R. 21.   GAF scores do not correlate to the severity requirements of the Act (66 Fed. Reg. 50746, 50764-65 (2000) and are not dispositive.  *See Colon*, 424 F. Supp. 2d at 812.  Therefore, the ALJ did not err in choosing not to afford them significant weight based on his review of the record.[7]

## VII.  CONCLUSION

It is well-settled that disability is not determined merely by the presence of impairments, but by the effect that the impairments have on an individual's ability to perform substantial gainful employment.  *Jones v. Sullivan*, 954 F.2d 129 (3d Cir. 1991).  In making assessments of the impact impairments have on a particular individual's ability to do work-related activities,

---

[7] Plaintiff does not explicitly argue that the Commissioner's decision is deficient at step five of the sequential evaluation process.  Nevertheless, such an argument is subsumed within the arguments plaintiff advances as to step three.  It is clear, however, that the above review and analysis leads to the same conclusion with regard to the ALJ's determination at step five: the decision is supported by substantial evidence.  Consequently, this court must uphold the decision even though it might have reached a different determination upon *de novo* review.

determinations of credibility are committed to the sound discretion of the ALJ and must be upheld where there is substantial evidence to support them. *Hartranft*, 181 F.3d at 358.

The ALJ explicitly weighed all relevant, probative, and available evidence, including Rose's hospitalizations for his serious mental impairments and provided a sound factual foundation for his decision. R. 11-24, *See also Adorno*, 40 F.3d at 48, *Cotter*, 642 F.2d at 705. The ALJ's decision as a whole contains substantial evidence to support his determination that Rose did not meet a listing and was otherwise not disabled. *See Adorno*, 40 F.3d at 46.

It is undeniable that Rose has serious mental impairments, and this Court is sympathetic and aware of the challenges which Rose faces. However, under the applicable standards of review and the current state of the record, this Court must defer to the findings of the ALJ and his conclusion that Rose is not disabled within the meaning of the Social Security Act. Therefore, the ALJ's decision must be affirmed.

Date: December 7, 2010

                                                  s/ David Stewart Cercone
                                                  David Stewart Cercone
                                                  United States District Judge


cc:     Lee Karl, AUSA

        Zenford Mitchel, Esquire

        Via: CM/ECF Electronic Filing